The next case is Ameren, Illinois v. The Illinois Commerce Commission. Please proceed. Thank you, Your Honors. My name is Mark Witt. I represent the Ameren, Illinois Company, the appellant in this case. And I'm here today because the ICC, or Illinois Commerce Commission, did not fulfill its duty to implement the Energy Investment and Modernization Act as that law is written. Now, since the title of that law is a mouthful, I'm going to refer to it simply as the Formula Rate Law in my discussion this morning. The legislature enacted the Formula Rate Law because it recognized that we cannot have a 21st century electrical system with 20th century regulation. What do I mean by 20th century regulation? Well, under that paradigm, the utility would spend money first, and then come to the ICC to make its case that it's entitled to recover those expenditures and rates. But the needs of the electrical system in Illinois have become so great that that model is no longer practical. It's simply too risky for Illinois utilities to spend hundreds of millions, if not billions of dollars, and then subject themselves to after-the-fact reviews about whether those expenditures were reasonable and necessary. So the overarching goal of formula rates is certainty, and not just certainty for the utility, but also for customers. The law promotes certainty through a carrots-and-sticks approach. The legislature came up with the term performance-based formula rate for a reason. If the utilities invest at levels mandated in the law, and they create a certain number of jobs, meet the prescribed performance standards, and do all of the other things that they're supposed to do under formula rates, then they are entitled under the law to recover their actual cost of delivery service. Customers are protected by provisions in the law for rate caps and for phasing in large investments. And the annual update process under formula rates protects both the utility and the customers because it ensures that the utility recovers its actual cost for the prior year, no more and no less. And if it does recover more, that gets refunded to the rate payer. So the legislature considered everyone's interests under formula rates, and it attempted to balance those interests. And as I'll discuss in a moment, the ICC's decisions below upset that balance. Now, I'm not suggesting that certainty means that electric utilities now get a blank check under formula rates. They don't. If an actual cost is imprudent or unreasonable, the commission can still disallow that cost, just like it always has. So, for example, turning in a receipt for a Ferrari does not mean that the utility can pass that cost along to rate payers. Of course, those aren't the types of costs we're talking about in this case. So Amarant is not claiming that the commission has no authority under formula rates to review costs. That's not what we're saying. Our position is simply that the formula rate law directs the commission to address certain costs in a certain way. The commission cannot address those costs differently on grounds that it thinks its treatment produces a more just and reasonable result than the legislature intended. Counsel, you indicate that this law was a departure and basically a change of course in how rates were set and how the companies would be compensated for their expenses. But when we look at, for instance, the issue on the actual capital structure issue, you have this language that says that they have to do this subject to a determination of prudence and reasonableness consistent with commission practice and law. And that's really where I have struggled with what does that mean? Consistent with commission practice and law. That to me is a link to the past of how you've always done this. I believe, Your Honor, you're referring to the language that addresses in the initial formula rate process that the hearing to consider the utilities formula rate template should be conducted in a process that's consistent with prior commission and law to the extent it does not conflict with this act. So the formula rate law, by its expressed terms, trumps prior law to the extent there's any inconsistency. And I would add on the capital structure issue itself, the commission historically has not looked at proxy capital structures or a parent company's capital structure. It's always started with the actual capital structure as a baseline. So our argument really is simply this, is that where the formula rate law specifies use of the utility's actual capital structure, the actual capital structure must be used. Where the formula rate law specifies two adjustments related to plant additions, those two adjustments must be made, not three adjustments. And declaring that a pot of rate payer-supplied funds is available to Ameren from accrued vacation pay just doesn't make it so. The orders below show repeated instances of the commission inventing ambiguity in the formula rate law where it doesn't exist, and then resolving that ambiguity to fit its own preferences. The commission orders, in fact, strayed so far out of bounds that they were overturned legislatively. But we still have three issues to deal with, and I'd like to talk about each of those now. Since we've wandered into capital structure, I will go ahead and start there. Now, capital structure is important because it directly affects the return authorized to the utility. Since equity financing is more expensive than debt, a greater percentage of equity in the capital structure will lead to greater returns. So by reducing Ameren's capital structure from roughly 54% equity to 51% equity, the commission took away millions of dollars from Ameren. In the initial case, 12001, the impact was about $3.2 million, and a little over $4 million in the update case. So this is real money we're talking about. And again, Section 16108.5c requires formula rates to reflect, quote, reflect the utility's actual capital structure for the applicable calendar year, excluding goodwill, subject to a determination of prudence and reasonableness consistent with commission practice and law. Your Honor, that goes to the language that you had pointed out. There is no affirmative obligation in the formula rate law that the utility has to make some demonstration of reasonableness other than demonstrate what its actual capital structure is, and that's readily ascertainable from the FERC Form 1. But that sounds like you're saying that they have to automatically accept whatever Ameren says it is. No. If the commission made a finding that the commission finds the company's actual capital structure is unreasonable or imprudent, if they make that finding, they can change the capital structure. The problem here is that they didn't make that finding. The finding they made is, frankly, bizarre in its own right, where the commission basically is saying, well, rather than paraphrase it, let me quote it. Individually, the concerns raised by staff are insufficient to win the day. But cumulatively, the commission is persuaded that staff's imputed capital structure is appropriate. There simply is no finding here that Ameren's actual capital structure is inappropriate, imprudent, wrong, whatever adjective you want to use. And certainly, if that were the case and the commission thought there was evidence of impropriety in the capital structure, that ought to be communicated to the utility so it can conform its conduct in a manner consistent with expectations. None of that was done here. We're just left with the commission saying, we've considered this individually. The arguments don't persuade us, but apparently, if there are enough bad arguments, those will add up to a good argument, so we will agree with staff. That's essentially what the commission did. Let me move on to the issue of accumulated deferred taxes. I'll call it ADIT. And this issue has the largest dollar impact of the three. I know I tend to gloss over when we start talking about taxes. And that's okay, because you really don't need to know anything about tax accounting to resolve the issue in this case. The relevant statutory language says that adjustments in the FERC Form 1 must be made for two things, or three things, depending on how you read the second. The language is, quote, plant additions and correspondingly updated depreciation, reserve, and expense for the calendar year in which the tariff and data are filed. The commission acknowledges in its orders that the statute is silent on the third adjustment that it made for deferred taxes. So the issue, really, is whether authority for this third adjustment can be inferred from the language I just quoted, or elsewhere in the form of the rate law. And the answer is, no, it cannot. And, in fact, there's no reason to infer anything into this statute, except for what is written, unless your goal is to achieve some end that the statute doesn't provide for. And that's what the commission did. Well, counsel, when a statute lists things that you are to do and doesn't list other things, doesn't that mean that what's excluded was not meant to be included? Correct, Your Honor. Under the, I can never remember the entire title of the canon, but expressio uneus is the general idea. Well, your Latin is better than mine. The inclusion of one is the exclusion of the other, or something like that. I think we're on the same page. And that was, hopefully, much more articulately stated in our brief than I just stated it. And on this whole idea of deferred taxes, there were two recent cases, 2010, 2011, thereabouts, where this cumulative deferred income tax issue came up. The appellate courts were aware of it. In fact, I argued the case in front of this court for Cameron. And had the legislature wanted the results from those appellate court cases to obtain under formula raids, it could have said so, and it didn't. So it was aware of the issue, expressly provided two of the adjustments, but not the third. The third issue doesn't have a tremendous dollar impact for Ameren, but it's still important to the company. And this is with respect to vacation approvals. Most of the ICC's brief on this issue focuses on arguments that Ameren did not properly preserve the argument or waived it. We addressed those arguments in our brief, and I'm happy to stand on the brief in response. But recall for the capital structure and the ADIT issue, part of the commission's justification was that it believed its decisions were consistent with past commission law and practice. Interestingly, on the vacation approval issue, it completely disregarded its prior law and practice. It had not made this vacation approval adjustment before in any previous Ameren Electric case, and in fact, it didn't make the adjustment in an Ameren Gas Raid case that had been decided less than a year previously. So commission law and practice either matters or it doesn't, and it would seem that it only matters to the commission when it suits their ends. Now, on the merits, the source of funds that provides the commission isn't  Well, it's not, Your Honor, but I think those cases also say that where the commission departs from its practice, it should articulate some grounds for doing so. And it didn't here. With respect to vacation approval, the ICC suggests that specific dollars of specific employees are put into an account somewhere, like a Christmas club account, and as benefits are earned throughout the year, the account increases and then there's a pot of money for the employee to go on vacation, and then the company gives the money to the employee. And that's just not how it works. Employees are continuously earning vacation. They're continuously taking vacation. There are debits and credits entered in the books and records of the company. The act of writing down what the company is going to owe somebody for vacation in a future period does not create a source of funds that the company can use to invest in poles and towers and wires and all of those things. Any more than me writing down what I need to be saving up to take my kids to Disney World results in a pot of money for us to go on vacation. These are really accounting entries. There isn't a pot of cash that the company can use. Let me just conclude my remarks by saying this, that under traditional rate making, the legislature gave the commission largely a blank canvas in which to create rates. Under formula rates, the legislature gave the commission a canvas as well, but the outline of the picture is already on that canvas under formula rates. And where formula rates requires Ansel Adams of the commission, the commission gives us Salvador Dali. And this court should reverse. Thank you. Thank you. For the employee, who's going to argue first? Mr. Wiggins. I intend to take about eight minutes and Mr. Wiggins will use the remainder. May it please the court, my name is Conrad Reddick, and I represent the rate payer appellees appearing as the Illinois Industrial Energy Consumers, IIEC. The order on appeal established AMRA's initial rates under the formula rate law, particularly sections 108.5C and D of the public utility insurance act. AMRA challenges the commission's exercise of its rate making expertise in determining several cost elements used to calculate the formula rates. IIEC will respond to only one aspect of the order, the commission's decision to take account of ADIT in determining the rate base used to set AMRA's rates. In our view, the commission's decision on ADIT is lawful under the formula rate law and it appropriately uses the commission's established practice for rate base determinations. It should be sustained. AMRA argues that the formula rate law unambiguously requires that the commission ignore ADIT in determining rate base. AMRA's burden as appellant is unlikely to be met with any lesser showing. First, the public utilities act mandates the presumption that the commission's orders are reasonable. Second, though this court reviews questions of law de novo, controlling case law requires that the courts give judicial deference to the commission's interpretation of its enabling statute and its expert implementation of rate making provisions. If there is a reasonable debate about the meaning of a technical rate making provision, the commission's expert determination on that question must prevail. Third, the commission's evidentiary findings regarding the reasonableness of considering or ignoring ADIT, evidence AMRA would dismiss as irrelevant, are part of the commission's required prudence and reasonableness review and they are prima facie true. AMRA's arguments rest on a single premise, that the formula rate law is so detailed and specific that the commission's expert implementation decisions were unnecessary and therefore unlawful. The commission's expertise and its actual experience implementing this law led the commission to the opposite conclusion. The determinations were required by the prudence and reasonableness requirements mandated. Contrary to AMRA's argument, the formula rate law is not a wholly self-contained regulatory regime. The formula rate law, as Justice Holder-Bright pointed out, expressly incorporates an existing body of law. The rate payer protections and regulatory law defined by Article 9 of the Public Utilities Act. In addition, as AMRA concedes, the formula rate law expressly incorporates the requirement for prudence, reasonableness, and established commission practice under Article 9. Moreover, the commission, like the courts, is required to interpret the formula rate law in a manner that avoids conflict where reasonable. AMRA rejects that rule of construction, arguing for total displacement of the existing Public Utility Act requirements. But the silent, implied repeal of existing law that AMRA assumes in its arguments requires a manifest and total incompatibility of relevant provisions. That is far more than AMRA has shown. Specifically, as to the determination of AMRA's rate base, there are no such conflicts. First, to address the argument that Mr. Witt emphasized, AMRA argues that Section C6 provides the entire list of rate base elements that can be used to set formula rates, extinguishing the commission's authority to use any item not listed. AMRA is wrong. The provision AMRA relies on is a filing provision, not a rate-making directive. The overarching rate-making directive of the formula rate law is the recovery of AMRA's actual costs, a determination uniquely within the commission's expertise and practice. The statute's express incorporation of existing rate-making law and practice disproves any intent to displace the commission's active role. Finally, the commission found on this record that many items necessary to set formula rates, including ADIT, are not explicitly listed in the statute. In addition, under the formula rate law, rates must recover AMRA's actual, prudent, and reasonable rate base costs and reflect its actual capital structure. The commission found, as this Court has held for AMRA in an AMRA case, that a reasonable determination of AMRA's prudently incurred rate base must take account of AMRA's ADIT, a non-investment source of capital. Under Article 9, specifically Section 9-11, a utility's rate base is limited to the value of investment that is prudently incurred and actually used to provide service, its actual cost, which excludes capital not invested by the utility. Thus, the ADIT adjustment is required both under the new formula rate law and under the old Article 9 rate-making. AMRA incorrectly characterizes the commission's obedience to these essentially equivalent requirements as disagreements with legislative policy. Fair enough. The significance of a less than comprehensive list has been the subject of a number of decisions. And with respect to that, this Court has held, quote, the force of the inference from silence depends on whether, under the circumstances, some further expression would have been expected. That's from this Court's Geekus Opinion, cited at page 45 of our brief. The General Assembly, having preserved existing rate-making practices to accomplish its objective of defining and recovering the utility's actual cost, it is neither expected nor logical for the legislature to list the hundreds, if not thousands, of individual accounting items that go into the calculation of AMRIN's formula rates. I think the dozens of pages of cost calculations that AMRIN filed to support its proposed rates confirm the Commission's finding on this point. AMRIN's arguments do not support a reversal of the Commission's exercise of its regulatory expertise in setting AMRIN's formula rates. The Commission's ADIT adjustment reflects a reasonable, harmonious construction of the old and new PUA provisions, Public Utility Act provisions, a construction that gives effect to the formula rate process while preserving the non-conflicting Article IX law and Commission practice to produce just and reasonable rates at every stage of the process. The Commission's consideration of ADIT in determining AMRIN's rate base should be sustained. Thank you. Thank you. You may proceed. Good morning, Your Honors. James E. Wagging, Special Assistant Attorney General, on behalf of the Respondent Illinois Commerce Commission. The two direct administrative review actions taken by AMRIN involved the Commission's original setting of AMRIN's formula rates and the Commission's first annual reconciliation under AMRIN's formula rates. This Court will be giving Section 16-108.5 of the Public Utilities Act its first judicial review of the Commission's construction. However, as to the three issues raised by AMRIN, the heart of AMRIN's contentions is that Section 16-108.5 bars all ordinary considerations elsewhere required in the Utilities Act, and that contention is contrary to the expressed provisions within Section 16-108.5. I don't want to read the briefs are full of these sections. I mean, under C and D about how subject determination, prudence, and reasonableness. I do emphasize, though, Paragraph C-6, which provided nothing to sections intended to allow costs that are not otherwise recoverable to be recoverable by virtue of inclusion, for one. And then it goes on to say, such reviews shall be based on the same evidentiary standards, including but not limited to those concerning prudence and reasonableness of costs. It's a very broad adoption of the other provisions of Article 9 of the Public Utility Act, except for certain things such as how cost of equity is determined, because that's set specifically in the new Act. We can't use normalization. That's expressly forbidden. Turning to the other common issue, the capital structure issue. Both of the orders on review rejected the equity component claimed by Ameren in this capital structure. Both rejections are based on evidence. In both cases, the Commission adopted staff's evidence, and that can be seen that in page 128 of the original order, it said the Commission finds merit in staff's arguments. In the reconciliation case on page 108, they persuaded by staff's position Ameren failed to present any change in law or facts to justify a change from the Commission's original decision. Now, if you take a look earlier to the Commission's finding as to what staff's evidence was, which is usually listed staff's position and all that, in the first case, staff on page 124 of the order said it was not the capital structure, the equity component was not prudent or reasonable. By the time the annual reconciliation case, the first case, comes up, the staff testimony is concluded as it violated Section 9230. And that, of course, is what this whole thing is about. Section 9230 is a provision of the statute that changed how capital structure is required to be done by the Commission. Prior to 9230, the Commission usually accepted the structure shown by the company unless there was proof of manipulation or some sort. We generally accepted that. 9230, though, says that that is not necessarily what we have to do. And that, of course, was the holding in the belt case and in the cup case cited therein, where the actual capital structure no longer enjoys a presumption of reasonableness. And that is adopted back into the new Section 16108.5. This company, which is a delivery service electric utility, which does not face competition for that service, has more equity claim than its holding company does. Its holding company, of course, has many other subsidiaries, many of which are in competitive markets, which usually acquire more equity. That is the theory about the level of equity that a company needs more equity if you're in competition because you face more of those kind of problems. The stockholders want a better return. We have no explanation from Amerit ever why this is true. All they've told you is, well, that's the way we put it down, 4.1, that's good enough. And that isn't good enough. In the first case, it was said that they needed an equity range between 45 and 55 percent in order to appease the stock market and the ratings organizations and whatnot. Although that testimony was not repeated in the reconciliation case, but in any event, the numbers chosen in both cases by the Commission are within that range. In the absence of any explanation as to why they need more equity, it does give them more money. And that's, of course, what the staff's main position was, is that a higher equity benefits the company, but there's no objectiveness here. There's nothing to say anything about. Finally, I'll get to the issue only raised in the reconciliation case, and as the Court is aware, we don't know how they can raise this issue in the first place because the statute at 16108.5d1 specifically provided the first reconciliation is not intended to provide for recovery costs previously excluded from rates based on a prior Commission order finding prudence or unreasonableness. The vacation pay was excluded in the original formula rate setting, and we came back and asked for it again. Now, the Commission did look at their evidence, but they haven't explained how they get around the fact that they weren't supposed to be changing the formula on the first reconciliation. Counsel talks about certainty. Well, that was part of the certainty, is that once that formula was set, that applies on every reconciliation. Now, there is a method for changing that formula, but it actually, as I understand it, always goes outside, well, mostly goes outside the reconciliation case. You have to do it as a separate tariff matter, with one exception that's going on right now, which I won't get into. Let me ask you a question. It bothers me to some extent that the legislature adopted an act which substantially changed some things at the Commission in how they did their business, correct? Well, it changed some things. Okay. And during the first go-round of rate-making, Hamrick would suggest that the Commission ignored what the legislature had said. Whether that's true or not, that's not the point. But what strikes me is that after your first decision, the legislature, both the House and the Senate, passed resolutions saying, no, we meant what we meant to say, and the Commission didn't get it. I mean, I'm spilling that down. One of the problems with at least one of the resolutions that was issued after the decision was made, and there isn't anything we could have done. Right. But doesn't that give you some pause, though? It gave the Commission pause, but the Commission's reading said, this is what the statute said. You told us Article 9. You said it's just the same except for the certain items you changed, that we're supposed to be doing this, just like it's an ordinary rate case under Article 9, 9201. The General Assembly then subsequently did amend the statute and gave retroactive relief to Hamrick and ComEd on, of course, those issues that got mooted out, but they didn't touch these issues. They didn't change it. They didn't strike out all that stuff about that this is subject to Article 9 or anything else, or specifically write in, as they did with normalization, oh, there shall not be any normalization. They didn't say, there shall not be added related to projected costs. They didn't write any of that. The statute still reads, as the Commission constructed, on the issues remaining before the court. We always wonder, though, about the legal effect of a declaration from the legislature, which doesn't actually amend the statute itself. They didn't express their will to us. We don't ignore that will. We go back every year for our budget. You don't tell the legislature that. But, nonetheless, it isn't the same as passing an amendatory law, which, like I say, on some issues they did, but they didn't rewrite the entire statute, and the rewrite did not affect the present issues before the court. I don't know what else I could say. If the court has no further questions, I will at least let you know. Well, I've got one other one. Okay. And that is vacation pay. I don't understand how that becomes an asset of the company. Well, that's because it's never been expensed out. That was one of those peculiar things. In the record, staff presented how the fund has grown through the electric side during 2011. It's a roughly $13 million reserve that actually never diminished in any way. That's why, because when the employee earns the vacation, the rate payers pay for that, the company holds on to that money, and then when the employee takes a vacation, they have to expense it out. But how this is actually working within the 2011 case is that it never goes down. It varied no more than $215,000 a month. So the company has this money sitting for use. But isn't it committed to their obligation to pay the accrued vacation of the employees? Well, yes. But wouldn't you expect to see, if they were expensing this out, the amount would be one thing in February, and then after vacation time, say in September, the amount would actually drop? They're not expensing these things in the year. They're holding on to the stuff for years, and it is rather a stable amount. That was staff's position and evidence. We cite it in our brief somewhere. And they have the use of that money. But wouldn't it make as much sense for Ameren to just say, here's our budget for salaries, wages. And every employee gets two, three, or four weeks vacation, but basically we just pay them their salary during their vacation period? I mean, I don't understand. I think that's what the vacation pay is, is that the employees earn vacation, but they get their salary while on vacation. But it is accounted separately from the... But that doesn't make any sense to me. At that point, I can't explain to the court because I have no accounting background whatsoever. Well, I don't see very many accountants here. But my problem is that when I ran a law firm and one of my associates took two weeks vacation, he just got paid for two weeks. Well, technically, though, the money had to have been earned before he went on vacation. I'm assuming he had money to pay him while he was gone. He wasn't earning any money. Well, in reality, I was making all the money. It came out of my pocket. Well, law firms are different. But, I mean, in one sense, they've earned the money already. It's already been paid and the company's holding on to it. I mean, if they didn't have that money ahead of time, then they wouldn't be theoretically able to pay him at all. But they had a budget for salary. It just doesn't make any sense. Well, it's not a good number of employees, so the company are not salaried either. They do have union workers working the line. They get hourly rates and whatnot. So with a big company like Ameritrade, they go this every which way. Okay. Thank you. Okay. Rebuttal? Thank you, Your Honor. I want to clear up any misperception that there may be that these cases are about the big, bad utility fighting for every last dollar. Let me give you some context. When Ameritrade filed its first formula rate case, the company itself proposed a $20 million decrease. The commission decreased rates by $50 million. And three months later in the update case, the commission reduced revenues by another $50 million. We're in an update case now. There's no order route. But parties are proposing reductions of $40 to $50 million. Okay. So to say that the commission has no role or we're taking the position the commission has no role in the process, that no expertise to offer, that just isn't the case. It's not belied by the facts. Administrative deference is one thing. But what the commission is arguing for is legislative indifference. It's fine to look at Article 9 for interpretive purposes to shed light on something. But the formula rate law itself says that to the extent there's any consistency with the formula rate law in Article 9, the formula rate law controls. So it controls. With respect to the capital structure issue, I think I heard counsel basically say that the commission, or it certainly was implied, that the commission has basically ignored the legislative presumption that the actual capital structure should be used. The presumption can be overcome. It wasn't here. But there's at least that presumption that actual capital structure can be used. And the new presumption, according to the commission, is that if the utility capital structure has an equity component that exceeds its parent, there's automatically something untoward in that. And now you, utility, have a burden to show us something. What they want us to show is sort of like trying to explain the smell of the color nine, that our actual capital structure is reasonable rather than their affirmative duty to show it's unreasonable if the evidence supports that and it didn't appear. Unless there are questions, that's all I have. I don't see any. Thank you. Thank you. We'll take this matter under advisement and stand recess until the readiness of the next case.